IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-CR-83 |
| | ) | |
| LEE CALVIN CARMACK, | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress

[Doc. 16], filed on August 6, 2012. The Court held an evidentiary hearing on this motion on August

31, 2012. Assistant United States Attorney Cynthia F. Davidson appeared on behalf of the

Government. Attorney Rachel L. Wolf represented the Defendant, who was also present. At the

conclusion of the hearing, the undersigned took the motion, the briefs, and the evidence under

advisement.

## I. POSITIONS OF THE PARTIES

On July 10, 2012, the Defendant was charged in an Indictment [Doc. 9], which alleges

that he was a felon in possession of a firearm and ammunition on or about June 12, 2012.

The Defendant asks [Doc. 19] the Court to suppress statements he made to law

1

enforcement on June 12, 2012, and June 29, 2012, because they were taken in violation of the Fifth and Sixth Amendments. The Defendant argues that each incriminating statement he made was in response to interrogation. The Defendant contends that while his dictated statement to Deputy Morelock was the result of traditional interrogation, his remaining statements were the result of officers engaging him in dialogue, which "encourag[ed] him to speak further." [Doc. 19. at 4].

The Defendant also contends that he did not validly waive his <u>Miranda</u> rights. First, the Defendant argues that he did not knowingly waive his <u>Miranda</u> rights. The Defendant argues that because of his diminished capacity, there is little evidence that he actually understood his rights. Second, the Defendant argues that he did not voluntarily waive his <u>Miranda</u> rights. The Defendant contends that the totality of the circumstances do not amount to a voluntary admission. Further, the Defendant states that the Government "should have at least taken minimal precautions to ensure that [he] actually understood his rights." [Doc. 19 at 5].

The Government responds [Doc.17] that the statements were voluntarily made and were free of any coercion by law enforcement. It argues that the Defendant was read his <u>Miranda</u> rights several times, and he later signed a written rights waiver. At the hearing, the Government argued that all the statements, except the statements given to Morelock during the interview, were not prompted, and thus, no interrogation had occurred. Accordingly, it urges the Court to deny the Defendant's request that the statements be suppressed.

## II. SUMMARY OF TESTIMONY

The Government presented the testimony of Detective Bobby Morelock with the Claiborne County Sheriff's Office ("CCSO"), Officer Larry Mozingo, who is presently with Lincoln

2

Memorial University ("LMU") but was a deputy with the CCSO at the time of the Defendant's arrest, Sergeant Larry Martin with the CCSO, Deputy Craig Owsley with the CCSO, and Special Agent Rebecca Bobich with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The Defendant presented the testimony of Katherine Miracle, his sister.

### (a) Testimony of Detective Bobby Morelock

Detective Bobby Morelock testified that he investigates major crimes for the CCSO. On June 12, 2012 at 6:30 p.m., he was called to investigate a shooting that occurred on 211 Rosebud Road, Cumberland Gap, Tennessee. Upon arrival, Morelock learned from others that the Defendant was involved in the shooting. Morelock testified that the Defendant was not present when he arrived, but he spoke with the Defendant's wife. Later, officers reported to Morelock that they had arrested the Defendant. Morelock told the arresting officers to bring the Defendant immediately to him because the location of the gun was still unknown. Morelock testified that when the Defendant arrived, he read the Defendant his *Miranda* rights. Morelock then asked the Defendant if he understood his rights, and the Defendant stated, "I understand my damn rights." Morelock testified that the Defendant stated that he threw the gun in the weeds and someone else must have taken it. The Defendant was then transported to the Tazewell Justice Center.

Morelock testified that when the Defendant arrived at the Tazewell Justice Center, the Defendant stated that he had drank a few beers before the shooting. Morelock asked Officer Larry Mozingo to transport the Defendant to the hospital for a blood and alcohol content ("BAC") test. Morelock testified that the Defendant did not seem intoxicated and that he had no reason to believe that the Defendant was intoxicated. Morelock stated it was his practice to take a suspect to the

3

hospital for a BAC if she or he had been drinking.

Morelock testified that after the Defendant was transported to the hospital for the BAC test, Officer Mozingo brought him back to the Tazewell Justice Center. The Defendant was placed in an interview room. The door was left open, and only Morelock was present in the room with the Defendant. Morelock testified that he showed the Defendant a <u>Miranda</u> waiver form [Exh. 1], and because the Defendant could not read, Morelock read the form to him word-for-word. While reading the form, Morelock paused several times to wait for questions, but the Defendant did not ask any questions. Morelock asked the Defendant if he understood, and the Defendant replied that he did. He testified that the Defendant seemed to understand and he never asked for an attorney. Morelock stated that he filled out all the information on the <u>Miranda</u> form, except the Defendant's signature. The Defendant signed his name at 10:20 p.m. After the Defendant signed the <u>Miranda</u> waiver, Morelock asked the Defendant about the shooting incident. While the Defendant described the events that occurred earlier that day, Morelock wrote the Defendant's statements. [Exh. 2]. Morelock testified that he read what he wrote to the Defendant as they went along. Morelock also asked the Defendant to sign both pages of the statement and initial the beginning and end of both pages.[1] Morelock testified that the Defendant was cordial to him and only became hostile when discussing the victim. The Defendant was not frustrated with Morelock. Morelock finished questioning the Defendant at 10:45 p.m. [<u>See</u> Exh. 2].

Morelock testified that the Defendant was arrested for a second time on June 29, 2012

---

[1]On cross-examination, Morelock explained that he always asked a person to sign his or her initials at the beginning and end to prove that nothing had been added to a written statement without the person's knowledge.

4

after a federal warrant had been issued. While Morelock testified he read the Defendant his <u>Miranda</u> rights again, he said he did not ask the Defendant to sign a <u>Miranda</u> waiver because he did not anticipate interrogating him.

On cross-examination, Morelock testified that he had prior criminal experiences with the Defendant in the 1990s, and during those incidents, the Defendant openly made statements and did not ask for an attorney. Morelock stated that the Defendant admitted he had a few drinks before the shooting occurred, but Morelock did not believe the Defendant was intoxicated. Morelock stated that it was his practice to take someone to the hospital even if he did not believe that the person was intoxicated. He testified that he was aware that the Defendant was not educated and came from humble means. Morelock stated that he knew the Defendant had nitro pills but was not aware of the Defendant's medical condition. Further, Morelock testified on cross-examination that he would not fabricate someone else's statement.

On redirect, Morelock testified that he did not add anything to the Defendant's dictated statement [Exh. 2] without the Defendant's knowledge.

### (b) Testimony of Officer Larry Mozingo

Officer Larry Mozingo testified that at the time of the Defendant's arrest, he had been a deputy with the CCSO for over ten years. He received a BOLO (be on the lookout) on a Ford pick-up truck on June 12, 2012. Mozingo met with officers near the Kentucky border to prevent the pick-up truck from crossing. The truck, however, never came through. Mozingo and three officers later found the Defendant at a residence on Yeary Road. The Defendant was in the bedroom when Mozingo arrested him. Mozingo placed the Defendant in the back of his police car and began

5

transporting the Defendant to 211 Rosebud Road, where the shooting incident took place. During the drive, the Defendant and Mozingo began discussing general matters, such as their families. Mozingo testified that he did not ask the Defendant any questions. The Defendant then began talking about the shooting incident that had occurred earlier. The Defendant stated, "The only regret I have is that I didn't kill him." Mozingo told the Defendant that if he was going to keep talking about the incident, Mozingo needed to read him his <u>Miranda</u> rights because he was facing serious charges. Mozingo testified that he then read the Defendant his <u>Miranda</u> rights and asked if he understood. The Defendant stated that he did. The Defendant continued making incriminating statements. Mozingo further testified that there was no indication that the Defendant did not understand his <u>Miranda</u> rights nor was there any indication that the Defendant was intoxicated. Mozingo stated that the Defendant spoke clearly.

Mozingo testified that he told Morelock that the Defendant made incriminating statements while in the vehicle, and Morelock told Mozingo to write the statements down. Mozingo done so, and his written statement was admitted as Exhibit 3.

On cross-examination, Mozingo testified that he did not ask the Defendant any questions. Mozingo testified that he read through all of the <u>Miranda</u> rights without pausing after each individual right. He testified that he knows that the Defendant comes from a humble background but is unaware of the Defendant's educational level.

Mozingo further testified on cross-examination that he later drove the Defendant to the hospital. The Defendant stated that he drank a few beers but that it was much earlier in the day. Mozingo stated that it was not unusual to have a person take a BAC test to ensure that there is nothing in his or her system. Mozingo testified that he has personally handled many driving under

6

the influence charges and that the Defendant did not appear intoxicated or under the influence. Mozingo stated that the Defendant was not asked any questions while at the hospital. Mozingo testified that he was present the entire time during the hospital visit but could not remember if the Defendant made an incriminating statement while he was there.

*(c) Testimony of Sergeant Larry Martin*

Sergeant Larry Martin testified that he is in charge of the CCSO facility. Martin stated that he also transports prisoners and helps with arrests. Martin testified that he had received a BOLO on June 12, 2012 for a Ford pick-up truck. Later, he and three officers found the Defendant at a residence on Yeary Road. Mozingo arrested the Defendant and took him to Morelock, who was still at the crime scene.

Later, Martin met Mozingo and the Defendant at the hospital in order to ensure safety while the Defendant was there. Martin testified that as he and the Defendant were leaving the hospital, the Defendant stated, "I shot one meth-maker and I go to jail. I done a favor to the county. Wished I had killed him." Martin testified that he did not ask the Defendant any questions before or after the Defendant made the incriminating statement.

On cross-examination, Martin testified that the incriminating statement was made about 9:00 p.m., and he wrote the statement down at 10:41 p.m. [Exh. 4]. Martin testified that Mozingo was present the entire time at the hospital. Further, Martin stated that he and Mozingo did not discuss any statements that the Defendant made that night or any of the statements that the Defendant made earlier to Mozingo. Martin testified that while the Defendant was at the hospital, he and the Defendant discussed general topics, such as derby cars. Martin stated that he usually talks

to suspects about general topics in order to get a person to calm down and think about other matters. Martin testified that he did not ask the Defendant any questions about the shooting incident. Martin stated that he did not respond to the Defendant after the Defendant made the incriminating statement and that he strictly listened. Martin also testified that the Defendant was very talkative, and he is unaware of the Defendant's educational standing, health, or financial position.

### (d) Testimony of Deputy Craig Owsley

Deputy Craig Owsley testified that he has been a road deputy with the CCSO since 2006. Owsley answers disturbance calls and makes arrests. On June 29, 2012, Owsley was contacted by Morelock, who asked him if he would transport the Defendant to the CCSO. When he arrived to transport the Defendant, Morelock was arresting the Defendant in the backyard. Owsley testified that he heard Morelock read the Defendant his _Miranda_ rights and ask if the Defendant understood. The Defendant stated that he did. Owsley then transported the Defendant to the Claiborne County jail.

While Owsley was transferring the Defendant, the Defendant stated, "Everything was fine until that son of a bitch moved in next door. He started fussing about the property line. I tried to ignore him, but when he started talking about my deceased mother, I lost it. Any man would lose it when someone talked about their mother." Owsley testified that he did not ask the Defendant any questions about the charges. Later, the Defendant also asked whether Owsley "had gotten the guns." Owsley advised the Defendant that he did not know whether the officers had retrieved any guns. The Defendant then stated that he had sold the guns, and that the guns were registered to his wife. The Defendant also stated that the guns were sold to his cousin.

On cross-examination, Owsley testified that he was the only one in the car with the

8

Defendant. Owsley stated that the divided window was open so the cold air would blow on the Defendant because he was sweating. Owsley also testified that he had transported the Defendant once before in the early 2000s. While Owsley was transporting the Defendant on June 29, 2012, he told the Defendant, "You probably know me because I transferred you before." The Defendant stated that he did. Owsley then testified that the Defendant stated that he would not hurt the officers. The Defendant then made the aforementioned statement explaining why he shot the victim. Owsley testified that he did not respond to the Defendant's statement. After the Defendant made the statement about selling the gun to his cousin, nothing else was said.

*(e) Testimony of Special Agent Rebecca Bobich*

Special Agent Rebecca Bobich with the ATFE testified that she is the case agent in the Defendant's case. She stated that she examined all the evidence and conducted the federal investigation in this case. Bobich stated that she filed a criminal complaint on June 28, 2012. She testified that she contacted Morelock to let him know that she had a warrant for the Defendant's arrest. The next morning, Morelock told Bobich that he had arrested the Defendant and the Defendant had been taken to the CCSO. Special ATFE Agent Lamar English, along with Bobich, went to pick the Defendant up. Upon arrival, Bobich read the Defendant his Miranda rights. Bobich stated that she went through each right and asked the Defendant if he understood the individual right. The Defendant stated after each right that he understood. He then signed the Miranda waiver. [Exh. 6]. Before they left the CCSO, Bobich testified that she told the Defendant, "I am not going to ask questions, and I don't want you to talk to me about this."

While Bobich and English were transporting the Defendant, he began making

9

incriminating statements about the shooting incident and the possession of the gun. Bobich testified that she told the Defendant multiple times that he needed to contact his attorney. The Defendant kept making incriminating statements. The Defendant stated that his wife owned the firearms at the house, and he knew that he was not supposed to have firearms because of his previous conviction. Bobich testified that the Defendant began explaining why he shot the victim. The Defendant stated that he was yelling back and forth with the victim, and the victim began calling the Defendant's mom names. The Defendant then stated he went in to get a shotgun, and that is why he had shot the victim. Bobich testified that the Defendant claimed that the victim was into methamphetamine.

On cross-examination, Bobich testified that she knew about the state charges that had already been filed and knew that the Defendant was previously out on bond. Bobich testified that she read each individual Miranda right, and after each one, she stopped and asked the Defendant whether he understood. Bobich testified that during the drive to Knoxville, she, the Defendant, and English were engaged in general conversation. When the Defendant began talking about the shooting incident, Bobich stated that she told the Defendant to wait because an attorney would be appointed later and that the Defendant should not talk because his statements could be used against him in court.

On redirect examination, Bobich testified that it is ATFE policy that if a suspect already has an attorney, agents are not allowed to discuss the charges with him or her without the attorney's presence. Bobich testified that she admonished the Defendant in the vehicle, not because she thought that the Defendant did not understand his rights, but because she thought that the Defendant already had an attorney in the state's case.

*(f) Testimony of Katherine Miracle*

Katherine Miracle testified for the Defendant and stated that she is the Defendant's sister. Ms. Miracle testified that she lived with the Defendant until he was nine years old, and then she moved out. She stated that they were very poor and went to a rural school. She testified that the Defendant had learning difficulties and did not perform well in school. She stated that when the Defendant was twelve, he drank anti-freeze, which diminished his brain capacity. She testified that the Defendant failed several grades in school and did not attend high school.

On cross-examination, Ms. Miracle testified that she has not been around the Defendant much since he was nine years old. She stated that she did not know if the Defendant could understand instructions and that the Defendant has never been admitted to a mental institution. She testified that she does not know whether the Defendant manages his bills or tends to his farm. Finally, she testified that she is not a psychiatrist and that she does not know what the Defendant is able to understand.

On redirect examination, Ms. Miracle testified that the Defendant has received disability payments for his mental problems for many years.

## III. ANALYSIS

The Fifth Amendment guarantees the right to remain silent and the right to assistance of counsel during a custodial interrogation. Tolliver v. Sheets, 594 F.3d 900, 916 (6th Cir. 2010). In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); United States v. Crowder, 62

11

F.3d 782, 786 (6th Cir. 1995) ("<u>Miranda</u> warnings are only required when the Defendant is in custody and subject to interrogation."). Interrogation has been defined as "express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of questioning includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Pennsylvania v. Muniz</u>, 486 U.S. 582, 600-01 (1990) (citing <u>Innis</u>, 446 U.S. at 291). Although the Fifth Amendment protects a person's right to remain silent, it is well-established that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." <u>Tolliver</u>, 594 F.3d at 919 (quoting <u>Miranda</u>, 384 U.S. at 478).

The Defendant first contends that all the statements were made pursuant to interrogation and should be suppressed as a violation of the Fifth Amendment. Second, the Defendant argues that he did not voluntarily and knowingly waive his <u>Miranda</u> rights.[2]

The witnesses who testified and the exhibits that were entered were not presented in chronological order during the suppression hearing. The Court finds that the Defendant, on five different occasions, made incriminating statements:

> (1) The statements made to Officer Mozingo while being transported to the scene;
>
> (2) The statements made to Sergeant Martin while walking out of the hospital;

---

[2] The Defendant argues in passing that his Sixth Amendment rights were violated. [Doc. 19 at 1]. However, the Defendant did not develop this argument in his memorandum or at the suppression hearing. Therefore, the Court will not address the Defendant's alleged Sixth Amendment violation. <u>See</u> <u>McPherson v. Kelly</u>, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

12

(3) The statements made to Detective Morelock during the interrogation;

(4) The statements made to Deputy Owsley on the way to the Claiborne County jail; and

(5) The statements made to ATFE Agents Bobich and English on the way to Knoxville.

The Court thinks it would aid in this case to analyze each statement in the order that it was made.

### (A) Statement 1: The Defendant's Statements to Officer Mozingo (Exhibit 3)

On June 12, 2012, Mozingo arrested the Defendant at a residence on Yeary Road and placed him in the back of his vehicle. Morelock told Mozingo to bring the Defendant back to the scene where the shooting occurred. During the drive to the crime scene, the Defendant and Mozingo discussed general topics, such as their families. The Defendant then began making incriminating statements about the shooting incident. The Defendant stated, "The only regret I have is that I didn't kill him." Mozingo told the Defendant that he was going to read the Defendant his <u>Miranda</u> rights because this was a serious charge. Mozingo read the Defendant his <u>Miranda</u> rights and asked if he understood. The Defendant stated that he did. The Defendant continued to make other incriminating statements. At no point during the ride did Mozingo discuss the incident or ask the Defendant any questions regarding the incident.

It is clear, and the parties have not argued otherwise, that the Defendant was in custody at the time he made statements to Officer Mozingo. The test to determine when an individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. <u>Michigan v. Chestnut</u>, 486 U.S. 567, 573 (1988); <u>United States v. Smith</u>, 594

F.3d 530, 536 (6th Cir. 2010). The Defendant was handcuffed, placed in the back of a police car, and was being transported back to the crime scene. Therefore, the Court readily finds that the Defendant was in custody. The next question the Court must address is whether the Defendant was interrogated while Mozingo was transporting him.

The Court finds that the statements made to Mozingo were spontaneous and not made in response to an interrogation. The Defendant and Mozingo only discussed general topics, such as their families. Mozingo testified that he did not ask the Defendant any questions during the trip; instead, the Defendant volunteered the statements. Similar to Innis, the Defendant was not responding to any express questioning. 446 U.S. at 302. Further, Mozingo did not subject the Defendant to the "functional equivalent" of questioning. Id. at 300-01. Mozingo testified that he and the Defendant talked generally about their families. This type of dialogue does not amount to the "functional equivalent" of questioning but was instead casual conversation. See United States v. Thomas, 381 F. App'x 495, 501-02 (6th Cir. 2010) (finding that the officer and the defendant were engaged in casual conversation when the defendant asked the officer about bonding issues and the officer asked the defendant if he needed to be somewhere). The Court also finds that Mozingo's testimony and the testimonies of all the other officers were credible and not impeached by the Defendant.

Although Mozingo interrupted the Defendant in order to read him his Miranda rights, Mozingo was not required to do so because no interrogation had occurred. Crowder, 62 F.3d at 786. In fact, "[p]olice may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a Miranda warning." Thomas, 381 F. App'x at 502 (quoting Tolliver, 594 F.3d at 920). Because the Court finds that the Defendant's statements were

14

volunteered, the Court need not address whether the Defendant validly waived his <u>Miranda</u> rights. Accordingly, the Court finds that the Defendant volunteered the statements to Officer Mozingo, and thus, they are not barred by the Fifth Amendment.

**(B) Statement 2: The Defendant's Statements to Sergeant Larry Martin (Exhibit 4)**

On June 12, 2012, after the Defendant had been arrested, the Defendant was taken to the hospital for a BAC test. Martin went to the hospital to ensure safety while the Defendant was there. The Defendant and Martin began talking about the Defendant's derby cars. When Martin was walking the Defendant out of the hospital, the Defendant stated, "I shot one meth-maker and I go to jail. I done a favor to the county. Wished I had killed him." Martin did not reply to the Defendant's statement nor did he ask the Defendant any questions regarding the shooting incident.

The Court finds that the Defendant's statements to Martin were spontaneous and not made in response to an interrogation. There was no express questioning regarding the shooting incident, and in fact, the Defendant was not asked any questions. Martin and the Defendant only discussed derby cars. Further, there was no "functional equivalent" of questioning. <u>Innis</u>, 446 U.S. at 300-01. It is not reasonably likely that a discussion on derby cars would elicit the Defendant to make an incriminating statement about the shooting incident. <u>Muniz</u>, 486 U.S. at 600-01; <u>see</u> <u>Thomas</u>, 381 F. App'x at 502 (holding that the officer did not initiate an interrogation because the question he asked was not designed to elicit an incriminating response but was instead casual conversation).

Moreover, the Defendant had been read his <u>Miranda</u> rights twice before he made the statements to Martin. Because the Court finds that the statements to Martin were volunteered, the

15

Court need not address whether the Defendant validly waived his Miranda rights. Accordingly, the Court finds that the Defendant volunteered the statements made to Martin, and thus, they are not barred by the Fifth Amendment.

**(C) Statement 3: The Defendant's Statements to Detective Morelock (Exhibits 1 and 2)**

The Defendant argues that although Morelock obtained a written rights waiver, the Defendant did not understand his rights, and thus, did not make a knowing waiver. Further, the Defendant contends that under the totality of the circumstances, the waiver was not voluntary.

A person may waive his or her Miranda rights. Miranda, 348 U.S. at 444. In order for a waiver to be valid, it must be "made voluntarily, knowingly, and intelligently." Id. The waiver inquiry proceeds as follows:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citing Fare v. Michael, 442 U.S. 707, 725 (1979)).

In examining the totality of the circumstances, the Court should look at the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Garner v. Mitchell, 557 F.3d 257, 261 (6th Cir. 2009) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Further, the inquiry is "not whether the 'criminal suspect knew and

16

understood every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" Id. (quoting Colorado v. Spring, 479 U.S. 564, 574 (1987)).  Diminished capacity is one factor "alongside other factors" that should be examined. Id. at 265 (finding that the defendant's Miranda waiver was knowing and voluntary even though he was in the borderline range of intelligence, suffered from a troubled upbringing, and lacked a good education).

After the Defendant was taken to the hospital, Mozingo brought him back to the CCSO facility. The Defendant was taken to an interview room, and the door was left open. Morelock was the only officer present in the interview room. Morelock showed the Defendant a Miranda rights waiver form. [Exh. 1]. Morelock knew that the Defendant was unable to read because of prior incidents with the Defendant, so Morelock read the form word-for-word.[3]  When reading the form, Morelock paused several times to wait for questions. Morelock filled out all the information and circled the words, "have been advised."  Morelock asked the Defendant if he understood. The Defendant stated that he did.  The Defendant then signed the Miranda rights waiver form at 10:20 p.m. [Exh. 1].

Morelock then asked the Defendant about the shooting incident. The Defendant explained what happened, and Morelock wrote down everything the Defendant stated as they went along. Morelock testified that the Defendant only became frustrated when discussing the victim and that the Defendant was not frustrated with Morelock. Morelock then read the Defendant what he had written. The Defendant signed both pages and placed his initials on the beginning and end of each

---

[3] This was the third time that the Defendant was read his Miranda rights.

page. Morelock finished questioning the Defendant at 10:45 p.m. [See Exh. 2].

The Court finds that considering the totality of circumstances the Defendant's waiver of his Miranda rights was made voluntarily, knowingly, and intelligently. First, there is no evidence of any coercion on behalf of the officers. Morelock was the only officer in the interview room and the door was left open. The Defendant never became frustrated at Morelock for asking questions. In addition, Morelock only questioned the Defendant for approximately twenty-five minutes.

Second, the waiver was made with "full awareness" of his rights. Moran, 457 U.S. at 421. Morelock went over the Miranda wavier form word-for-word. In addition, this was the Defendant's third time that day hearing his Miranda rights. In fact, when Morelock read the Defendant his rights earlier that day, the Defendant stated, "I understand my damn rights." During the interview, the Defendant did not ask any questions, he did not ask for an attorney, and he stated that he understood. The Defendant then signed his name on the waiver form. The Defendant also signed and initialed the dictated statement that Morelock wrote.

The Defendant argues that he has a diminished capacity, but there is no evidence that he did not understand his rights. The Defendant's sister, Ms. Miracle, testified that the Defendant performed poorly in school and should have been in special education. However, she also testified that she has not been around the Defendant much since he was nine years old. The Defendant is now fifty-seven years old. In addition, she testified that she does not know whether the Defendant is able to understand instructions. Moreover, diminished capacity is one factor "alongside other factors" that the Court should examine. Mitchell, 557 F.3d at 265.

Although the Defendant does not argue that he was intoxicated in his memorandum, the Defendant asserted at the suppression hearing that he had drank a few beers before the shooting

incident occurred, which he argued is another factor that indicates that he did not validly waive his Miranda rights. Both Morelock and Mozingo testified that the Defendant did not seem intoxicated. Mozingo was the first person to talk with the Defendant. Mozingo testified that the Defendant was speaking clearly and there was nothing to indicate that he was intoxicated. Mozingo stated that it was not unusual to take suspects to the hospital to make certain there is nothing in his or her system. Morelock also testified that the Defendant did not seem intoxicated. Morelock stated that he has been trained to identify intoxication, and there was no reason to believe that the Defendant was intoxicated. Morelock stated that it was his practice to take suspects to the hospital if they had been drinking. According to the testimony, the Defendant was given a BAC test, but Morelock had not received the results yet. In addition, the Defendant had been in custody for awhile. He admitted to drinking a few beers before the shooting occurred, and the shooting occurred at approximately 6:30 p.m. Morelock finished reviewing the Miranda rights waiver form at 10:20 p.m. Almost four hours had passed from the time that the Defendant could have had anything to drink. The Court finds there is no evidence the Defendant was intoxicated or under the influence of intoxicants. Accordingly, the Court finds that under the totality of the circumstances, the Defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

### (D) Statement 4: The Defendant's Statements to Deputy Craig Owsley (Exhibit 5)

On June 29, 2012, Morelock arrested the Defendant on a federal warrant for possessing a firearm and ammunition as a convicted felon. Morelock read the Defendant his Miranda rights and placed the Defendant under arrest. Owsley then transported the Defendant to the Claiborne County jail. While Owsley was transporting the Defendant, Owsley told the Defendant, "You

19

probably know me because I transferred you before." The Defendant stated that he did. Then, the Defendant stated that he would never hurt any of the officers. Owsley did not respond. The Defendant then stated, "Everything was fine until that son of a bitch moved in next door. He started fussing about the property line. I tried to ignore him, but when he started talking about my deceased mother, I lost it. Any man would loose it when someone talked about their mother." Owsley again did not respond. Later, the Defendant asked Owsley whether he "had gotten the guns." Owsley replied that he did not know if the officers retrieved the guns. The Defendant then stated that he had sold the guns to his cousin and the guns were registered to his wife. Owsley did not respond to the Defendant. Owsley testified that there were no other conversations that took place during the trip.

The Court finds that the Defendant's statements made to Owsley during the drive to the Claiborne County jail were spontaneous and not made in response to an interrogation. As mentioned above, the Fifth Amendment does not bar volunteered statements. Miranda, 384 U.S. at 478; Tolliver, 594 F.3d at 919. The Defendant argues that Owsley engaged the Defendant in dialogue, which "encourag[ed] him to speak further." [Doc. 19 at 4]. The Defendant failed to cite any authority on behalf of this argument. First, Owsley did not ask the Defendant any questions during the trip. Owsley's first statement, "You probably know me because I transferred you before," was nothing but mere casual conversation and was not designed to elicit an incriminating response. See Thomas, 381 F. App'x at 502.

In addition, Owsley's response to the Defendant's question regarding whether the officers found the guns was also not an interrogation. This statement was not a question, nor the functional equivalent of questioning, nor designed to elicit any type of response. In Thomas, the defendant was arrested for unlawful possession of a weapon. Id. at 496. While en route to the county

jail, the defendant asked the officer several questions about making bond and how long it took to make bond. Id. at 501. The officer responded to his questions and then asked if he needed to be somewhere. Id. The defendant then made incriminating statements. Id. The officer stopped the defendant and advised him of his Miranda rights. Id. The court found that the dialogue between the officer and the defendant, including the officer's question, was casual conversation and not interrogation. Id. at 502. Therefore, the court concluded that no Miranda violation occurred. Id. at 503.

In the present matter, Owsley engaged in even less conversation than the officer in Thomas. While the officer in Thomas answered questions and asked a question of his own, Owsley was simply answering the Defendant's question and did not ask any questions. Similar to Thomas, however, the Defendant and Owsley were engaged in casual conversation that did not amount to interrogation.

Although the Defendant argued at the suppression hearing that Owsley should have closed the divider to keep the Defendant from making statements against his interest, an officer is not required to take such actions. See id. at 502.

Moreover, Morelock read the Defendant his Miranda rights before Owsley placed him in the back of his car.[4]  However, because the Court finds that the Defendant's statements to Owsley were volunteered, the Court need not address whether his Miranda rights were validly waived.  Accordingly, the Court finds that the statements made to Owsley on the way to the Claiborne County jail were volunteered, and thus, they are not barred by the Fifth Amendment.

---

[4] This was the first time the Defendant was read his Miranda rights on June 29, 2012, and his fourth time hearing his rights since June 12, 2012.

**(E) Statement 5: The Defendant's Statements to Special Agent Rebecca Bobich
(Exhibits 6 and 7)**

Agents Rebecca Bobich and Lamar English met the Defendant and Owsley at the Claiborne County jail to transport the Defendant to Knoxville, Tennessee. Before the Defendant was placed in the back of Bobich's vehicle, Bobich read him his <u>Miranda</u> rights.[5] After Bobich read each individual right, she stopped and asked whether the Defendant understood. After each right was read, the Defendant stated that he understood his rights. He then signed the waiver. [Exh. 6]. Afterwards, Bobich told the Defendant, "I am not going to ask questions, and I don't want you to talk to me about this."

During the drive to Knoxville, Bobich stated that she, English, and the Defendant engaged in general conversation. Then, the Defendant began making incriminating statements. Bobich stopped the Defendant and told him multiple times that he needed to talk with his attorney. Bobich warned the Defendant to stop speaking because the Government was able to use any statements against him in court. The Defendant continued to make incriminating statements. [See Exh. 7].

The Court finds that the statements made to Bobich and English while they were transporting him to Knoxville were spontaneous and not made in response to an interrogation. During the ride to Knoxville, Bobich and English were engaged casual conversation with the Defendant. No questions were asked of the Defendant and nothing was said that would amount to the "functional equivalent" of questioning. In fact, when the Defendant began making incriminating

---

[5] This was the second time the Defendant was read his <u>Miranda</u> rights on June 29, 2012, and his fifth time hearing his rights since June 12, 2012.

statements, Bobich warned the Defendant it was not in his best interest to do so. Bobich told the Defendant multiple times that he needed to discuss matters with his attorney. Although the Defendant argued at the suppression hearing that this dialogue, plus the amount of time the Defendant was in the vehicle with the agents, amounted to an interrogation, the Defendant has not cited any case law to support his argument.

Moreover, the Defendant was read his <u>Miranda</u> rights twice before he was placed in the back of Bobich's vehicle. Morelock read him his rights while he was being arrested, and Bobich read them again before he was placed in the vehicle. In fact, Bobich went over each individual right with the Defendant and asked if he understood each right. The Defendant stated that he did and then signed the rights wavier. [Exh. 6]. Because the Court finds that the statements to Bobich and English were volunteered, the Court need not address whether the Defendant validly waived his <u>Miranda</u> rights. Accordingly, the Court finds that the Defendant volunteered the statements made to Bobich and English, and thus, they are not barred by the Fifth Amendment.

## IV. CONCLUSION

After carefully considering the evidence, the parties' arguments, and the relevant legal authorities, the Court finds no basis to suppress any of the statements made by the Defendant. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motion to Suppress [**Doc. 16**] be **DENIED**.[6]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).